UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHENITHA COMB; SHERITA SIMS-COTTON; MINNIE ENGLISH; PATRICIA NEAL; TRACEY EADEN; LAKEISHA PARKER; NAOMI FLEMMING; IRIS WILLIAMS; BEVERLY BASHIR; BRENDA WITHFIELD; KATHY BUTLER; and DEMETRIUS HAWKINS, | § § § § § § § § | |
| | § | CIVIL ACTION NO. 10-CV-3498 |
| Plaintiffs, | § § | |
| | § | |
| v. | § § | |
| BENJI'S SPECIAL EDUCATIONAL ACADEMY, INC.; RON ROWELL, SUPERINTENDENT, BENJI'S SPECIAL EDUCATIONAL ACADEMY; KAY CARR, MEMBER, BOARD OF MANAGERS, BENJI'S SPECIAL EDUCATIONAL ACADEMY; JAMES HOLMAN, MEMBER, BOARD OF MANAGERS, BENJI'S SPECIAL EDUCATIONAL ACADEMY; EARNESTINE PATTERSON, MEMBER, BOARD OF MANAGERS, BENJI'S SPECIAL EDUCATIONAL ACADEMY; and ROBERT SCOTT, COMMISSIONER, TEXAS EDUCATIONAL AGENCY, | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiffs' Amended Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 2), Plaintiffs' Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 7), Plaintiffs' Amended and Corrected Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief

1

(Doc. No. 8), and Defendants' Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 5). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Plaintiffs' Amended Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 2) should be denied, Plaintiffs' Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 7) should be denied as moot, Plaintiffs' Amended and Corrected Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 8) should be granted in part as to leave to amend their complaint and denied otherwise, and Defendants' Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 5) should be denied as moot without prejudice to refiling in light of Plaintiffs' second amended complaint.

## I.    BACKGROUND

This case arises from the abrupt closure of Benji's Special Educational Academy (the "Academy"), a charter school located in Houston's Fifth Ward, and the resulting disruption upon approximately 500 students and their families. Plaintiffs are parents and guardians acting as next-friends of fourteen students who receive education at the Academy pursuant to Individualized Education Programs ("IEP") mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. The Defendants are the Academy itself, its current superintendent Ron Rowell, the members of the Board of Managers installed by the Texas Education Agency ("TEA"), and the commissioner of the TEA (the "Commissioner").

A summary of the events leading to the closure of the Academy is necessary. This summary, except as noted, does not appear to be in dispute. The Academy was granted an open-enrollment charter (the "Charter") by the Texas State Board of Education ("SBOE") on

November 2, 1998. (Doc. No. 2, Plaintiff's Amended Verified Complaint ("Pl.'s Complt."), Exh. 1 at 1.) The Charter specified that it would remain in effect from November 2, 1998 through July 31, 2003, unless renewed or terminated. (*Id.*) Paragraph 6 of the Charter states that it may be renewed upon "timely application" by the Academy for an additional period of time determined by the SBOE. Upon the Charter's expiration on July 31, 2003, the Academy made a timely application for renewal of the charter. The renewal application has been pending ever since. The TEA has allowed the Academy to continue operating during the pendency of the renewal application. (Pl.'s Complt., Exh. 7 at 3.)

Though the circumstances leading to the current crisis have been unfolding over the last several years, the Court will focus on the events beginning in the summer before the current school year. On July 8, 2010, the Commissioner notified the Academy's then-executive director, Ms. Theaola Robinson, that he intended to appoint a Board of Managers and a new superintendent in light of the ongoing financial, academic, and governance issues with the Academy. (Pl.'s Complt., Exh. 2 and 7.) On August 19, 2010, a "record review" hearing was held to provide Ms. Robinson and the Academy with an opportunity to respond to the Commissioner's intention to appoint a Board of Managers and a new superintendent. (Pl.'s Complt., Exh. 2 at 2.) Ms. Robinson attended the August 19th hearing with her counsel, who allegedly submitted a late-filed closing statement. On September 3, 2010, the Commissioner sent a letter to Ms. Robinson and the members of the Academy's board of directors notifying them that he had decided to appoint a Board of Managers to act as the governing body for the Academy and a new superintendent for the Academy, Rick Schneider. (Pl.'s Complt., Exh. 2 at 1, 4.) Under TEC § 39.112(b), the Commissioner's appointment of a Board of Managers suspended the powers of Academy's board of directors and Ms. Robinson.

One of the Board of Managers' first steps was to post notice on September 10, 2010 of a meeting the Board would be holding on September 13, 2010. (Pl.'s Complt., Exh. 3.) The notice was accompanied by an agenda stating that one of the agenda items was "discussion and possible action on <u>suspending</u> school programs and/or operations due to budget shortfall." (*Id.* at 3. (emphasis added)) In addition, the agenda stated that the Board would consider the "assignment, reassignment, termination or other action" with respect to the school's superintendent/CEO, administrative staff, instructional staff, and other employees. (*Id.*) Notably, neither the notice nor the agenda referred to the possibility of the Academy's permanent closure or the Charter's revocation.

On September 14, 2010, the new superintendent, Rick Schneider, notified students' parents that the Board of Managers had voted the night before to suspend operations of the school effective at the close of *that very same day* (i.e. September 14th). (Pl.'s Complt., Exh. 4.) This note did not offer the parents any assistance in locating another school for their children other than attaching a list of approximately forty schools in the Houston, Aldine, and North Forest school districts with addresses and phone numbers. (*Id.*) Parents were told in the notice that they could pick up their childrens' school records over the next two business days during the hours of 9:00 a.m. and 3:15 p.m. (*Id.*) After Thursday, September 16, 2010, parents would have to contact a regional service center to request their childrens' records. (*Id.*)

Believing the Board of Managers' suspension of operations to be unauthorized, the Academy's former administration along with several other Academy staff members allegedly engaged in a number of disruptive actions on September 14, 2010. The staff members and former administration allegedly told students to rip up the note from Mr. Schneider to their parents relaying the fact of the Academy's suspension of operations. (Pl.'s Complt., Exh. 5, at 3.)

Further, the "former superintendent" allegedly told students during a school assembly that the TEA did not think the students were "good enough" to be at the Academy and wanted to shut down the school for that reason. (*Id.*) This person allegedly told the assembled students that he or she would not allow Mr. Schneider to carry out the closure of the Academy. (*Id.*) Both during the assembly and during an employees-only meeting that day, the "former superintendent" allegedly stated that he or she would ensure that the Academy would remain open and instructed staff to report to work in the morning as usual. (*Id.* at 4.) Next, this person conducted a televised press conference inside the Academy informing the public that the Academy would continue operating despite the decisions of the Board of Managers and Mr. Schneider. (*Id.* at 4.)

The following day, September 15, 2010, the Academy reopened as an "unaccredited private school," using the Academy's facility and school buses. (*Id.* at 5.) By this point, Mr. Schneider had resigned his position and been replaced by Ron Rowell as superintendent of the Academy. Mr. Rowell attempted to prepare students' records for distribution to their parents, but was refused access to these records. (*Id.* at 5-6.) Staff from a regional educational service center were similarly refused entrance to the Academy. (*Id.* at 5.)

On September 16, 2010, the Commissioner issued an order suspending the charter operations and funding of the Academy. (*Id.*) TEC § 12.1162(b) authorizes the Commissioner to temporarily withhold funding, suspend the authority of a charter school to operate, or "take any other reasonable action the commissioner determines necessary to protect the health, safety, or welfare of students enrolled at the school based on evidence that conditions at the school present a danger to the health, safety, or welfare of the students."[1] In his September 16th order, the Commissioner used the actions of the Academy's staff and former administration during the

---

[1] Notably, TEC § 12.1162(b) does not provide the Board of Managers with authority to suspend a charter school's operations. It remains unclear what legal authority served as the basis of the Board's decision on September 13, 2010 to suspend the operations of the Academy.

previous two days as the basis for his finding that conditions at the Academy presented a danger to the health, safety, or welfare of the students. (*Id.* at 6.) As required by TEC § 12.1162(d), the Commissioner scheduled a hearing for the charter holder on September 21, 2010.

The hearing mandated under TEC § 12.1162(d) was held on September 21, 2010 before the Commissioner's designee, Emi Johnson. In a report to the Commissioner dated September 22, 2010, Johnson stated that the following evidence showed that conditions at the Academy presented a danger to the health, safety, or welfare of the students: school staff instructed students to rip up the communication to parents issued by the school superintendent notifying parents that the school would suspend operations on September 14th; telling the students that TEA did not think the students were "good enough"; directing students to ride on buses and attend classes on September 15th; obstructing the superintendent's access to school records and the school facility. (Pl.'s Complt., Exh. 6.) Johnson concluded that there was no evidence that any of the conditions had changed. (*Id.* at 3.) Moreover, Johnson noted that there was no statement indicating that the Academy would comply with the September 13th decisions of the Board of Managers. (*Id.*)

After this hearing had been held, the Commissioner was required under TEC § 12.1162(e) either to cease the suspension of the Academy's operations, or to initiate an action pursuant to TEC § 12.116 to modify, place on probation, or revoke the Charter. The Commissioner elected to initiate revocation proceedings as to the Academy's Charter. On September 24, 2010, the Commissioner initiated revocation of the school's charter pursuant to TEC § 12.115(a) [providing the grounds for charter revocation] and 19 TAC § 100.1021(a). (Pl.'s Complt., Exh. 7.) In his letter, the Commissioner outlined the following grounds for revocation of the charter: (1) failure to protect the health, safety or welfare of students, *see* 19

TAC § 100.1022(e)(1); (2) material violations of its open-enrollment charter, *see* 19 TAC § 100.1022(f)(1); (3) two consecutive years of unsatisfactory ratings; (4) serious unsatisfactory fiscal performance, *see* 19 TAC § 100.1022(c)(1)(C); (5) unsatisfactory compliance performance for three consecutive school years, *see* 19 TAC § 100.1022(d)(1); and (6) failure to renew a lease for the school facility, *see* 19 TAC § 100.1215. (*Id.*)

It is unclear whether the September 24th letter served merely as a notice of the Commissioner's intent to revoke the Academy's Charter, or actually revoked the Charter "*effective immediately*." (*Id.* at 1, 3.) TEC § 12.116(b) states that, when revoking or denying renewal of a charter, the Commissioner must provide an opportunity for a hearing to the charter holder and to the parents and guardians of students at the school. *See also* 19 TAC § 100.1021(b) (stating that the Commissioner "shall notify the charter holder *before* modifying, placing on probation, revoking, or denying renewal of the school's charter") (emphasis added). On the other hand, 19 TAC § 100.1022(e)(1) states that an "open-enrollment charter authorizing a charter school that fails to protect the health, safety, or welfare of the students enrolled at its school shall be revoked *effective immediately*."

In either case, the Commissioner's September 24th letter informed the Academy that it could request a hearing under 19 TAC § 100.1021(d) if it notified the Commissioner within ten business days. Also on September 24, 2010, the Board of Managers posted a notice of a hearing that would be held on September 27, 2010. (Pl.'s Complt., Exh. 8.) The agenda for the September 27th hearing included implementation of the Commissioner's "action[s]." On September 27, 2010, Mr. Rowell sent a communication to parents of the students reiterating that the "Board of Managers of Benji's voted on Monday evening, September 13, 2010, to suspend operations of the school effective at close of business on Tuesday, September 14, 2010." (Pl.'s

Complt., Exh. 9.) The superintendent characterized the Commissioner's hearing on September 22, 2010 as resulting in a "final Order from the Office of the Commissioner to SUSPEND CHARTER OPERATIONS AND FUNDS." (*Id.*)

On September 27, 2010, Plaintiffs filed suit in this Court alleging that Defendants' actions to suspend operations and revoke the Charter of the Academy violated their statutory due process rights under IDEA, 20 U.S.C. § 1415, and their constitutional due process rights. In addition, Plaintiffs claim that Defendants' actions were arbitrary and capricious and violated the Texas Educational Code and the regulations promulgated thereunder. Plaintiffs seek a temporary restraining order and injunctive relief to order Defendants to refrain from closing the Academy, to rescind the notice suspending and/or terminating the Academy's operations, and to comply with the due process requirements of IDEA. Defendants have responded by moving to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction. Subsequent to Defendants' motion to dismiss, Plaintiffs have filed for leave to amend their complaint.

## II.    MOTION FOR LEAVE TO AMEND PLEADINGS

Plaintiffs have filed two motions for leave to file a second amended verified complaint and application for a temporary restraining order and injunctive relief (Doc. Nos. 7 & 8). The Court will treat the second amended complaint attached to Doc. No. 8 (the "Proposed Second Amended Complaint") as the one Plaintiffs seek leave to file. Plaintiffs seek to amend their complaint in order to: (1) add two new plaintiffs—Randolph Nichols and Nancy Watta—who are teachers at the Academy (the "Proposed Teacher-Plaintiffs") and accredited to teach in Texas public schools; (2) add a new defendant—Rick Schneider—who served as the superintendent of the Academy between September 3, 2010 and September 14, 2010; (3) allege that the actions

taken by Defendants violated the Proposed Teacher-Plaintiffs' rights to procedural due process and equal protection; and (4) add the violation of 42 U.S.C. § 1983 as a new cause of action.

### A. Legal Standard

A party may amend its pleadings once as a matter of course. Fed. R. Civ. P. 15(a)(1). Thereafter, pleadings may be amended "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The trial court should consider whether permitting the amendment would cause undue delay in the proceedings or undue prejudice to the nonmoving party, whether the movant is acting in bad faith or with a dilatory motive, or whether the movant has previously failed to cure deficiencies in his pleadings by prior amendments." *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir. 1982). In the absence of any of these reasons, including futility of amendment, the leave should be "freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a)(2).

The Fifth Circuit has interpreted "futility" in the context of Rule 15 to mean that "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000). To determine futility, a court must apply the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.* When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief— including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A court applying the Rule 12(b)(6) standard generally cannot look beyond the pleadings when determining whether an amended complaint would be subject to dismissal for failure to state a claim. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).

### B.  Analysis

The Court believes that leave to amend should be granted. The Rule 15(a) factors favor granting leave to amend. Plaintiffs have sought to amend their complaint at an early stage in the proceedings. An amendment would not create undue delay as the parties have not yet made initial disclosures, agreed to a case management plan, or begun discovery. Defendants would not be prejudiced by an amendment because they have the opportunity to address Plaintiffs' new causes of action in a subsequent motion to dismiss or motion for summary judgment. *See Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (affirming district court's denial of leave to amend complaint to add new defendant and new claims, after extensive discovery and pretrial activity, because proposed amendments would fundamentally change nature of litigation and unfairly prejudice defendant).

Defendants first argue that amendment of Plaintiffs' pleadings would be futile because the Proposed Teacher-Plaintiffs are at-will employees without a property interest in continued employment that gives rise to due process protections.[2] Plaintiffs' Proposed Second Amended

---

[2] Defendants also argue that the Board of Managers' September 13, 2010 vote was not illegal or unauthorized and, therefore, much of what Plaintiffs seek to add to their complaint is futile and frivolous. However, even if the Board of Managers' September 13, 2010 vote was authorized by statute or regulation, the Proposed Teacher-Plaintiffs' could allege that the suspension deprived them of their property interest in continued employment without due process. Moreover, these allegations are not new. Plaintiffs have claimed since their First Amended Complaint that the Board of Managers' September 13th vote was unauthorized. (Doc. No. 2 at ¶ 28.)

Complaint claims that the closure of the Academy violated the Proposed Teacher-Plaintiffs' rights to procedural due process prior to dismissal from or termination of employment.[3] (Doc. No. 8-1 at ¶ 75.) Public employees, including teachers, are entitled to due process protections prior to termination if they have a property interest in continued employment. *Bd. of Regents v. Roth*, 408 U.S. 564, 576-578 (1972). In order to have a property interest, individuals must show that they have "a legitimate claim of entitlement" to continued employment rather than a "unilateral expectation of it." *Id.* at 577. Entitlement to continued employment may be founded upon statutory language creating such an entitlement or contractual or tenure provisions that require a hearing before dismissal or termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). In addition, in the absence of an explicit contractual provision, a property interest may arise from an implied contract or mutually understood informal procedures. *Perry*, 408 U.S. at 601-02; *see also Connell v. Higginbotham*, 403 U.S. 207, 208 (1971) (holding that a teacher recently hired without tenure or a formal contract, but with a clearly implied promise of continued employment, could not be summarily dismissed from public employment with hearing or inquiry).

The Court, accepting as true the complaint's well-pleaded facts and viewing them in the light most favorable to Plaintiffs, finds it plausible that the Proposed Teacher-Plaintiffs possessed an entitlement to continued employment giving rise to a property interest. Under *Perry* and *Connell*, the lack of a formal employment contract or tenure provision is not fatal to the Proposed Teacher-Plaintiffs' claim that they enjoyed a property interest deserving of due process protections. In fact, in *Roane v. Callisburg Indep. Sch. Dist.*, 511 F.2d 633, 638-39 (5th Cir.

---

[3] It is important to distinguish the factual scenario presented here, where the Proposed Teacher-Plaintiffs challenge their dismissal in the middle of the school year, from cases in which a teacher challenges the non-renewal of an employment contract for a following year. *See, e.g.*, *Wells v. Hico Independent School Dist.*, 736 F.2d 243, 255 (5th Cir. 1984).

1975), the Fifth Circuit held that the plaintiff had an expectation of continued employment through the end of the school year following his dismissal, despite the lack of a written contract, due to the "common law" of the school district, including both written policies and actual practices. Similarly, in *Bryant v. St. Helena Parish Sch. Bd.*, 561 F. Supp. 239, 245 (M.D. La. 1983), a district court held that a teacher without an employment contract had a reasonable expectation of continued employment through the end of the school year, and that this expectation was based upon the fact that she had been hired for that school year and upon the governing language contained in the applicable personnel policy. Here, no mention is made in the Proposed Second Amended Complaint of the terms or contracts, if any, governing the Proposed Teacher-Plaintiffs' employment. Instead, the Proposed Second Amended Complaint states that the Proposed Teacher-Plaintiffs' property interest is founded upon their expectation that a charter school operating under an application for renewal will not be closed until the end of the school year. (*Id.* at ¶¶ 75-77.) If the Proposed Teacher-Plaintiffs believed that they worked at the Academy under a mutual understanding that they could not be dismissed prior to the end of the school year due to the Academy's renewal status, then the Proposed Teacher-Plaintiffs may, in fact, possess an entitlement to continued employment through the end of the school year. Such an understanding would not be baseless because, under TEC § 12.1161(b), the Commissioner's denial of a charter school's renewal application requires the state to continue funding the school for the remainder of the year. Taken together with the Proposed Teacher-Plaintiffs' allegation that they were effectively dismissed without a hearing when Defendants acted to suspend the Academy's operations, the Proposed Second Amended Complaint states a claim for a violation of the Proposed Teacher-Plaintiffs' right to due process upon which relief can be granted.

Defendants' arguments that such a claim would be futile are unsupported. Defendants claim in their response to Plaintiffs' motion for leave to amend their complaint that the Proposed Teacher-Plaintiffs are at-will employees who work without an employment contract and therefore do not enjoy an entitlement to continued employment. First, Defendants acknowledge that they cannot provide evidence of Nichols' and Watta's at-will employment status. (Doc. No. 14 at 5.) The Court may not consider the allegations submitted by Defendants regarding the Proposed Teacher-Plaintiffs' at-will employment status, since the Court may not look beyond the parties' pleadings in applying the Rule 12(b)(6) analysis. *See Spivey*, 197 F.3d at 774. Second, even if Defendants' allegations of at-will employment are true, at-will employment status alone does not defeat a finding that the Proposed Teacher-Plaintiffs possess a property right in continued employment as teachers at the Academy. *Perry* and *Roane* explicitly recognize that an entitlement to continued employment (and the consequent property interest) may be implied from the facts and circumstances surrounding a teachers' employment, rather than only from a written contract. Though an explicit and formal policy governing the Proposed Teacher-Plaintiffs' entitlement to their positions could defeat the Proposed Teacher-Plaintiffs' informal understanding that their employment would continue until the end of the school year, none has yet been submitted to the Court. *See Staheli v. Univ. of Miss.*, 854 F.2d 121, 125 (5th Cir. 1988) (holding that plaintiff's alleged property interest in tenure, arising from his implicit, mutual understanding that his position would continue, failed in light of the university's written tenure policy only allowing tenure to be granted by the chancellor of the university); *Batterton v. Tex. Gen. Land Office*, 783 F.2d 1220, 1223 (5th Cir. 1986) (holding that an informal understanding leading to a property interest may stand only in the "absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure"). Therefore, cases cited by

Defendants, such as *Moulton v. City of Beaumont*, 991 F.2d 227 (5th Cir. 1993), and *Garcia v. Reeves Cnty.*, 32 F.3d 200 (5th Cir. 1994), that involve at-will employment of non-educational employees are not determinative when examining whether the Proposed Teacher-Plaintiffs possessed a property interest.[4] *See also Farias v. Bexar Cnty. Bd. of Trustees for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 877 (5th Cir. 1991) (holding that the plaintiff, who continued working after the expiration of his employment contract as an at-will employee, did not have a property interest in the implied renewal of his contract).

Plaintiffs' new factual allegations that no financial crisis existed at the Academy to justify the Board of Managers' September 13, 2010 suspension of operations are relevant to this lawsuit, contrary to Defendants' arguments. An official's motive or intent behind his or her actions is relevant to the question of whether that official's actions constitute a deprivation of property within the meaning of the Due Process Clause. *Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."); *see also Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A]n essential element of some constitutional claims is a charge that the defendant' conduct was improperly motivated."); *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir. 1992) (providing that "unintentional conduct more culpable than negligence may deny due process"). Here, Plaintiffs allege that the Commissioner, the Board of Managers, and Mr. Schneider manipulated the reimbursement of certain sums to the Academy that it was owed, and in effect, created a financial crisis where none actually existed. The Plaintiffs further allege that the Defendants intentionally used this "fake" financial crisis to justify the suspension

---

[4]  Moreover, cases involving the termination of at-will employees by private employers, *see Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469 (5th Cir. 1991), and *Winters v. Houston Chronicle Pub. Co.*, 795 S.W.2d 723, 724 (Tex. 1990), while useful in understanding the Texas law regarding at-will employment, are inapplicable to the question of whether at-will public school teachers enjoy an entitlement to continued employment as a result of the facts and circumstances surrounding their service as teachers.

of the Academy's operations on September 13, 2010 without providing due process to the Proposed Teacher-Plaintiffs. These allegations are relevant to whether Defendants' actions in suspending operations, and thereby dismissing the Proposed Teacher-Plaintiffs without hearings, were simply negligent or, in fact, closer to reckless or intentional. Therefore, the Court will grant leave for Plaintiffs to add these factual allegations to the Proposed Second Amended Complaint.

Finally, the Court will grant leave to amend the complaint to add Mr. Schneider, the Academy's former superintendent, as a defendant in this action. Contrary to Defendants' arguments, Mr. Schneider is a necessary and proper party to this lawsuit.[5] Plaintiffs' Proposed Second Amended Complaint seeks redress under 42 U.S.C. § 1983 for Defendants' violation of Plaintiffs' federal statutory rights under IDEA and the Proposed Teacher-Plaintiffs' federal constitutional rights to procedural due process and equal protection. A plaintiff bringing a § 1983 action must "specify the personal involvement of each defendant." *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992). Plaintiffs allege that the violation giving them a right to relief under § 1983 arises out of the series of events leading up to and after the September 13, 2010 suspension of the Academy's operations. The Proposed Second Amended Complaint sets forth Mr. Schneider's involvement, along with that of the other Defendants, in these events. Specifically, the Proposed Second Amended Complaint alleges that Mr. Schneider implemented the Board of Managers' suspension by sending out a letter to parents notifying them of the Academy's closure and, as one of the Defendants, manipulated the Academy's financial situation. (Proposed Second Amended Complaint at ¶¶ 30, 52, 53, 54, 55, 58.) Mr. Schneider's

---

[5] The general standard on whether a plaintiff may add a defendant comes from Federal Rule of Civil Procedure 20(a). This rule states that a plaintiff may join in any civil action all persons against whom he has a claim if there is any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences and if there is any question of law or fact common to all defendants. Fed. R. Civ. P. 20(a)(2). However, when a plaintiff fails to join all parties under Rule 20(a) in his first complaint (or in his complaint as amended by right), leave of the court must be obtained to join such additional persons. Fed. R. Civ. P. 15(a)(2); see also *Wheat v. Mass*, 994 F.2d 273, 277 (5th Cir. 1993) (affirming the district court's decision denying leave to join additional defendants).

subsequent resignation as superintendent is irrelevant since the Proposed Teacher-Plaintiffs

allege that the wrongful actions depriving them of procedural due process occurred before his

resignation. (*Id.* at ¶ 58.) Mr. Schneider's addition as a defendant is also proper because

questions of law, such as qualified immunity, are common among all individual Defendants,

including Mr. Schneider. Finally, Plaintiffs' Proposed Second Amended Complaint seeks

nominal and punitive damages for Defendants' violation of § 1983, and so Mr. Schneider may be

able to provide the relief requested by Plaintiffs.[6]

## III.    MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs have applied for a temporary restraining order and injunctive relief to restrain

Defendants from engaging in activities that allegedly violate Plaintiffs' due process rights under

IDEA and Plaintiffs' federal constitutional rights to due process. The Court concludes that

Plaintiffs have not met their burden of showing that they possess a substantial likelihood of

prevailing on the merits of these claims.

### A.  Legal Standard

"A preliminary injunction requires that 'the applicant . . . show (1) a substantial

likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable

injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to

the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve

the public interest.'"  *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007)

(quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir.

2003)).  Although the grant or denial of a preliminary injunction rests in the discretion of the trial

court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), "[w]e have cautioned

repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted

---

[6] The individual Defendants are named in both their official and personal capacity.

unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

### B.  Analysis

The Court finds that, at this stage of the proceeding, Plaintiffs have not shown a substantial likelihood of prevailing on the merits of their claims. "To determine the likelihood of success on the merits, we look to the standards provided by the substantive law." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). The Court will review in turn both Plaintiffs' claims of violations of their federal statutory rights under IDEA, and the Proposed Teacher-Plaintiffs' claims of violations of their federal constitutional rights to procedural due process.

### 1.  Plaintiffs' Rights under IDEA

Plaintiffs claim that the Board of Managers' decision to suspend operations of the Academy violates their due process rights under IDEA. Specifically, Plaintiffs argue that they were deprived of their rights to notice and hearing as required by 20 U.S.C. § 1415. Though Plaintiffs do not bring claims that the right to free appropriate public education of students with disabilities has been violated, the viability of their claims of due process violations ultimately rests on a determination that students subject to IDEA's protections are being treated in such a way that triggers their parents' and guardians' rights to due process under IDEA.

The purposes of IDEA are, among others, "to ensure that all children with disabilities have available to them a free appropriate public education . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." *Id.* §§ 1400(d)(1)(A)-(B). To this end, IDEA requires that the local education agency ("LEA") or state educational agency

effectuate IEPs at the beginning of every school year for each child with a disability in the agency's jurisdiction.[7] *Id.* § 1414 (d)(2)(A). In addition, any state educational agency or LEA that receives funding under IDEA is required to establish and maintain procedures in accordance with 20 U.S.C. § 1415 to ensure that children with disabilities and their parents are "guaranteed procedural safeguards with respect to the provision of a free appropriate public education." *Id.* § 1415(a).

One aspect of the procedural safeguards mandated by IDEA is the requirement of "written *prior* notice to the parents of a child, in accordance with subsection (c)(1), whenever the local educational agency—(A) proposes to initiate or change . . . the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." *Id.* § 1415(b)(3). Subsection (c)(1) specifies that the notice required must contain a description of the proposed agency action, an explanation of why the agency proposes to take the action, and a description of the agency's bases for taking such action, and a statement notifying the parents that they have due process rights under IDEA to challenge such action. A parent must be given an opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free public education to such child." *Id.* § 1415(b)(6)(A). A party wishing to make a complaint under this section must provide "due process complaint notice" to the adversary party and forward a copy of it to the State. *Id.* § 1415(b)(7). The "due process complaint notice" is distinct from the "written prior notice" required to be given by the LEA or state educational agency to a parent prior to the proposed change in placement. The state educational agency or LEA must provide

---

[7] Section 1414(e) also requires that "[e]ach local educational agency or State educational agency [] ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e).

for an impartial due process hearing and appeal. *Id.* §§ 1415(f), (g). Parents may seek judicial review of adverse administrative determinations. *Id.* § 1415(i)(2).

Plaintiffs' claims focus on the failure of Defendants to provide them with the prior written notice prior to suspending operations of the Academy.[8] They argue that Defendants' closure of the Academy and their directive to parents of IEP students to find new schools constitutes a change in the "educational placement" of the student that triggers the written prior notice requirement of 20 U.S.C. § 1415(b)(3). Defendants argue in response that the IEP students' transfer to a new school is only a "change in location" and not a "change in educational placement" requiring prior written notice to parents.

Contrary to Defendants' arguments, case law does not establish a *per se* rule that a "change in location" does not constitute a "change in placement" under IDEA. In the leading case of *Concerned Parents & Citizens for the Continuing Education at Malcolm X (PS 79) v. New York City Bd. of Education*, 629 F.2d 751 (2d Cir. 1980), the Second Circuit addressed the question of what constitutes a "change in placement" triggering the notice and hearing requirements of the Education for All Handicapped Children Act of 1975 ("EAHCA").[9] The facts are similar to those presented here. The NYC Board of Education decided in the summer of 1979 to close P.S. 79, a school in which 185 of the 310 students were handicapped children enrolled in special education classes. *Id.* at 752. The Board notified parents of the school closing and subsequently transferred the students to various schools within the same school district. *Id.* The plaintiffs—composed of children, parents, and guardians—filed suit alleging that the

---

[8] Plaintiffs cite *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), as authority for the proposition that states may not prevent individuals from using established adjudicatory procedures when such action would be "the equivalent of denying them an opportunity to be hard upon their claim[ed] rights." *Id.* at 428 (quoting *Boddie v. Connecticut*, 401 U.S. 371 (1971)). However, Defendants here have not cut off Plaintiffs' rights to file complaints and request due process hearings as mandated by IDEA's guarantees of procedural safeguards. *See* 20 U.S.C. §§ 1415(b)(6), (f). Plaintiffs' ability to seek administrative remedies remains open.
[9] The 1975 Act was revised and renamed as IDEA in 1990. The provisions at issue remain the same.

transfer had violated the Due Process Clause of the 14th Amendment, EAHCA, and provisions of the New York Education Law. *Id.* The district court declined to reverse the transfer, but instead ordered the Board to provide the students with educational programming equivalent to what they received prior to the transfer. *Id.* The district court further held that the transfer constituted a "change in placement" and defined this term to be "any significant alteration in the programs, activities, or services provided by the defendants to the handicapped children . . . . including changes in the degree to which handicapped children are integrated with non-handicapped children in these programs and activities, as well as significant changes in curriculum, extra-curricular offerings, class composition and teacher assignments." *Id.* at 752-53. The district court concluded that the failure of the Board to provide a prior notice and hearing before the transfer violated the provisions of EAHCA. *Id.* at 753.

The Second Circuit rejected the district court's construction of the term "change in placement." The court instead held that "educational placement" refers only to the "general type of education program in which the child is placed and not to all the various adjustments in that program that the educational agency, in the traditional exercise of its discretion, may determine to be necessary." *Id.* at 756. The Second Circuit relied on the statute's legislative history, the implementing regulations, and policy considerations for its restrictive interpretation of the meaning of "educational placement." The court then engaged in a fact-specific inquiry and found that the transferred children remained in the same classification, the same school district, and the same type of educational program. *Id.* The court found that the Board made a good faith effort to "preserve intact as far as possible the basic educational programs that the transferred children had formerly enjoyed." *Id.* Finally, though the court did not believe that the notice and hearing requirements of 20 USC § 1415(b) were necessary, it noted that the Board sought community

input when the school closing seemed likely. *Id.* at 756-57. The court ended by noting that its decision should not be understood to mean that "there are no constraints on the power of school boards to close schools and transfer students," but rather that their holding was limited to the facts of the case. *Id.* at 756.

Although the Fifth Circuit has adopted a narrow interpretation of the "change in placement" definition, it, too, has declined to adopt a rule stating that a "change in location" can never constitute a "change in placement." Rather, the Fifth Circuit has focused on the continuity in the IEP's implementation from one school to another. In *Weil v. Bd. of Elementary & Secondary Educ.*, 931 F.2d 1069 (5th Cir. 1991), the court held that the transfer of a severely mentally retarded child from one school to another upon the closing of the first school did not constitute a "change in placement." *Id.* at 1072. The court found that "[t]he programs at both schools were under OPSB supervision, both provided substantially similar classes, and both implemented the same IEP for Kimberly." *Id.* Therefore, the court held that no prior written notice was required "under the particular facts of this case." *Id.* In *Sherri A.D. v. Kirby*, 975 F.2d 193 (5th Cir. 1992), the Fifth Circuit reviewed a case involving a 19-year-old woman who was deaf, blind and mentally retarded. The woman had been institutionalized at the Texas School for the Blind for several years when the School changed its policies and decided that the woman should no longer live there. *Id.* at 197. At issue before the Fifth Circuit was a pending order of a magistrate judge ordering the woman's transfer to a community placement setting. The court held that, "[i]n ordering Sherri transferred from the School for the Blind, the magistrate judge did not alter Sherri's individualized educational program ("IEP"); merely the location in which her IEP is to be implemented." *Id.* at 206. The court noted that there was "little evidence in the record" to support a claim that the woman's educational program *necessarily* would change

"merely because of a change in location in which it is provided to her." *Id.* at 206 n.22 (emphasis added). Rather, "[t]he mere fact that one location may be able to provide better services, or services beyond those required by the IEP, does not mean that delivery of educational services at another location would be inappropriate." *Id.*

In *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003), the court held that IDEA's requirement that parents be involved in determining "educational placement" does not necessarily mean they must be involved in site selection. *Id.* at 379. The court in *White* rejected the parent's argument that "education placement" refers to the "location" or a "particular school," but instead found that the term relates to a "setting," such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction. *Id.* at 380.

In an unpublished case, *Veazey v. Ascension Parish Sch. Bd.*, Case No. 04-30109, 2005 WL 19496 (5th Cir. Jan. 5, 2005), the court held that a school district's transfer of a deaf child from one school three miles from his home to another seven miles away did not constitute a "change in placement." *Veazey*, 2005 WL 19496 at *1. The transfer required the child "to ride a special school bus used to transport disabled children instead of a regular school bus, and required him to share a transliterator with another hearing impaired student instead of having a private transliterator." *Id.* However, the court found that the change in school site was not a change in placement; that the IEP did not require the provision of a personal transliterator; and that the change in school buses was not a "fundamental change" in the IEP. *Id.*

In contrast, a district court in Louisiana found that a school transfer did constitute a change in placement triggering the notice and due process hearing rights of a parent. *Jonathan G. ex rel. Charlie Joe G. v. Caddo Parish Sch. Bd.*, 875 F. Supp. 352 (W.D. La. 1994). The student

22

had been transferred from a school in which he was allowed to interact with non-special education students (at lunch, assemblies and during physical education) to a more restrictive school allowing no interaction with non-special education students and imposing a highly structured and supervised program. *Id.* at 367.

At least one other circuit has declined to find that a "change in placement" could never arise from "change in location." In *Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577 (D.C. Cir. 1984), a severely handicapped child was transferred from an inpatient hospital to an outpatient special education program. The circuit court noted that the type of program required by disabled children was "too individualized" for it to conclude that a change in residential placement never constitutes a change in educational placement. *Id.* at 1582. However, the court held that the child's guardian had not identified the fundamental change in, or elimination of a basic element of the education program for the change to qualify as a change in educational placement. *Id.*

The case most heavily cited by the Plaintiffs, *Petties v. District of Columbia*, 238 F. Supp. 2d 114 (D. D.C. 2002), clearly holds that "any fundamental change in, or elimination of, a basic element of the educational program qualifies as a change in placement." *Id.* at 98 (quotations and citations omitted). Once an IEP is in place, there can be no change in placement without providing the student and parents with the due process rights provided under IDEA, including notice and the opportunity for an administrative due process hearing. *Id.* at 91, 97. Significantly, the district court stated that parents must be given notice of the proposed change in location *even if* the school district did not believe the change in location constituted a "change in placement" under IDEA. The district court held that parents have a right to challenge the school district's determination that a change in location does not constitute a change in placement. In

order to do so, parents must be provided with notice and the opportunity to "argue that the changes proposed do in fact effect fundamental changes in the student's educational program." *Id.* at 98. Therefore, the school district's intention to relocate students without providing parents with prior notice and a prior hearing (if requested) violated IDEA's due process protections. *Id.* at 97.

Admittedly, the Fifth Circuit's cases on this issue have not found that a "change in placement" occurred in the facts presented in those cases, where the student changed school locations. However, key to the Fifth Circuit's holdings was an acknowledgment that the new schools would not fundamentally change the composition of the students' IEPs. Though the Fifth Circuit has not addressed whether the role played by the LEA or state educational agency in maintaining continuing of the IEP is a relevant factor when determining whether a change in location constitutes a change in placement, the Second Circuit in *Concerned Parents* emphasized the good faith effort made by the NYC School Board to maintain the same classification of students, same school district, and same educational programs that the students had enjoyed at their closed school.

Here, the record lacks evidence of any efforts made by Defendants to maintain the IEP students' continuity of education other than a list of schools (without indication of their relative distance from the Academy) sent home to parents by Mr. Schneider *on the very same day the Academy's operations were suspended*. In his communication to parents on September 14, 2010, Mr. Schneider made no effort to provide any other assistance to parents in finding a new school for their children with disabilities or ensuring that the IEPs would not be fundamentally changed, but merely offered daytime hours when school records could be picked up. The list of schools did not contain any information about services each school offered for children with disabilities.

It was not until September 27, 2010, when Defendants realized that their efforts at closing the Academy had run aground, that another communication was sent home to parents informing them of a "school enrollment fair" at which parents could learn "about the options" they had in enrolling their child in a local public school. The assistance provided by this fair was mitigated by its scheduling on the very next two days during business hours, when parents presumably would be at work, and its occurrence *two weeks after the Academy's closure on September 14, 2010*.

Despite Defendants' lack of efforts to ensure that students' IEPs continue uninterrupted and composed of the same basic elements of the educational program, it is the Plaintiffs' burden at the preliminary injunction stage to show that the change in location contemplated by the Academy's closure constitutes a change in placement triggering their right to written prior notice under IDEA. Plaintiffs have failed to identify the elements of the IEPs of the students with disabilities that would be modified or eliminated as a result of the Academy's closure and the students' enrollment in new schools. The Court must be able to review the evidence of change in the educational setting and programming in order to determine whether these constitute a change in placement. Without more than the bare allegation that students with disabilities face a change in placement, Plaintiffs cannot show that they are likely to succeed on the merits of their claim that Plaintiffs' rights to due process under IDEA have been violated.

Further, Plaintiffs have not yet met their burden of showing that they are excused from the requirements of administrative exhaustion of remedies under IDEA.[10] The Fifth Circuit has not addressed whether administrative exhaustion is a prerequisite for federal jurisdiction over civil actions brought under IDEA, but has stated that a plaintiff either must exhaust

---

[10] Plaintiffs cannot escape the requirements of administrative exhaustion by pleading a cause of action under 42 U.S.C. § 1983 based upon violations of their rights to written prior notice under IDEA. *See Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 592 (W.D. Tex. 2006).

administrative remedies or bears the burden of showing that exhaustion would be futile or inadequate before seeking judicial review. *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 112 (5th Cir. 1992); 20 U.S.C. § 1415(l). In addition, the Fifth Circuit has recognized that administrative exhaustion may be excused when a plaintiff alleges either "*systematic* violations that a hearing officer would have no power to address" or a settled state policy that cannot be addressed through IDEA's administrative remedies. *Papania-Jones v. Dupree*, Case No. No. 07-30959, 2008 U.S. App. LEXIS 8307, at *7-*8 (5th Cir. Apr. 17, 2008) (quoting *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 113 (2d Cir. 2004)). Plaintiffs claim that administrative exhaustion would be futile because their right to written prior notice before a change in their childrens' educational placement has already been violated. Plaintiffs also argue that exhaustion would be inadequate because the administrative process will take between 45 and 60 days to complete, by which time the students with IEPs will be irreparably harmed. However, Plaintiffs' arguments of futility and exhaustion miss the mark. The issue that would be presented to the hearing examiner, and if appealed, to the state educational agency, is whether the students' change in schools as a result of the Academy's closure constitutes a "change in placement" triggering parents' due process rights under IDEA. If the hearing officer or educational agency finds that there has been a change in placement, they could fashion an appropriate remedy to address the students' concerns regarding the modification of their educational programs, though they may be unable to remedy Plaintiffs' failure to receive written prior notice. Plaintiffs imply, through their heavy reliance on the *Petties* case, that the violations alleged are systematic and the result of a settled state policy that cannot be addressed in administrative proceedings. *Petties* arguably addresses both a situation where settled state policy (the decision not to continue funding providers of special education) and a systematic violation (the disruption of a great number of students' IEPs)

served as the basis for the district court's finding that the plaintiffs were excused from exhausting their administrative remedies. Similar systematic violations and settled state policy may exist here, but Plaintiffs have not met their burden of showing that these factors are present and allow them to bypass the requirement of administrative exhaustion.

### 2.   Proposed Teacher-Plaintiffs' Due Process Rights

Plaintiffs have also failed to show that there is a *substantial* likelihood that they will succeed on the merits of their cause of action under 42 U.S.C. § 1983 alleging that Defendants' actions in suspending the Academy's operations violated the Proposed Teacher-Plaintiffs' federal constitutional due process rights. Section 1983 provides injured plaintiffs with a cause of action when they have been deprived of federal rights under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). The statute reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must (1) allege a violation of rights secured by the constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person [or entity] acting under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d at 215.

Plaintiffs here have alleged they were deprived of their property right in continued employment at the Academy without any hearing. In order to prove that their due process rights were violated, Plaintiffs must show that they have "asserted a recognized liberty or property interest within purview of Fourteenth Amendment and that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Woodard v.*

*Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d at 450). As described in Part II.B, Plaintiffs have stated a plausible claim in their Proposed Second Amended Complaint that they possess a property interest due to their expectation of continued employment through the end of the school year despite their potential status as at-will employees. However, even though Plaintiffs have alleged enough to survive a Rule 12(b)(6) analysis, they do not meet the standard of "substantial likelihood" that they will prevail on the merits of the claim. Plaintiffs have not yet introduced evidence of the content and scope of representations made to them regarding a promise or other understanding that they would enjoy employment at the Academy through the end of the school year due to the Academy's renewal status. Without such evidence, the Court does not have enough evidence to conclude, for the purposes of a preliminary injunction analysis, that Plaintiffs possess a valid property interest, which is a prerequisite to a due process claim founded on deprivation of a property interest.

As a result Plaintiffs' failure to show a substantial likelihood of success on the merits on either their IDEA or constitutional due process claims, the Court need not review the other requirements for injunctive relief, including the likelihood of irreparable injury, balancing of harms, and the public interest. The Court leaves aside a determination of whether it has the power to award equitable relief in the form of restoring the *status quo* just prior to the Board of Managers' September 13, 2010 suspension of the Academy's operations since Plaintiffs have not yet shown that they are likely to succeed on the merits of their claim.

IV.     **CONCLUSION**

Because Plaintiffs have failed to establish that they possess a substantial likelihood to succeed on the merits of their claims brought under IDEA and pursuant to 42 U.S.C. § 1983, the Court cannot grant a preliminary injunction. Plaintiffs' Amended Verified Complaint and

Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 2) is **DENIED**, Plaintiffs' Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 7) is **DENIED** as moot, Plaintiffs' Amended and Corrected Motion for Leave to Amend Verified Complaint and Application for Temporary Restraining Order and Injunctive Relief (Doc. No. 8) is **GRANTED** in **PART** as to leave to amend their complaint and **DENIED** otherwise, and Defendants' Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 5) is **DENIED** as moot without prejudice to refiling in light of Plaintiffs' second amended complaint.

      **IT IS SO ORDERED**.

      **SIGNED** at Houston, Texas, on this the 15th day of October, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE