UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHENITHA COMB, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-10-3498 |
| | § | |
| BENJI'S SPECIAL EDUCATION | § | |
| ACADEMY, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This case began as an action by a group of parents and guardians challenging a decision by the Board of Managers of Benji's Special Educational Academy, Inc. ("the Academy" or "Benji's") to suspend operations at their children's school. Over the past several months, Plaintiffs have attempted to transform the case into something decidedly different. Pending before the Court is Plaintiffs' Motion for Leave to File a Third Amended Complaint (Doc. No. 44). Defendants and non-party KTRK Television, Inc. ("KTRK") have each submitted responses. (Doc. Nos. 48 and 47.) After reviewing Plaintiffs' Motion, the responses, and the applicable law, the Court finds that it does not have subject matter jurisdiction over some of new claims which Plaintiffs seek leave to incorporate into their Third Amended Complaint. The Court therefore GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Leave to File Third Amended Complaint.

I.    **Background**

A.  **Procedural Background**

1

Plaintiffs' Complaint and Amended Complaint (Doc. Nos. 1 and 2) were filed on behalf of a group of parents and guardians acting as next-friends of fourteen students who received education at the Academy pursuant to Individualized Education Programs ("IEP") mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. The defendants included in First Amended Complaint were the Academy itself, the Academy's superintendent Ron Rowell, members of the Board of Managers installed by the Texas Education Agency ("TEA"), and the commissioner of the TEA (the "Commissioner"), Robert Scott.

On November 3, 2010, Plaintiffs filed their Second Amended Complaint (Doc. No. 19), adding two new plaintiffs and one new defendant. The new plaintiffs were Randolph Nichols and Nancy Watta, teachers at the Academy. The new defendant was Rick Schneider, the former superintendent of the Academy.  Plaintiffs and Defendants included in the Second Amended Complaint are hereinafter considered the "Original Plaintiffs" and "Original Defendants."

On November 9, 2010, The Academy was dismissed as a defendant. (Doc. No. 20.) Thereafter, Plaintiffs filed four pleadings, titled "Joinders," through which they sought to bring a number of new plaintiffs and defendants into the action. (Doc. Nos. 21, 25, 27, 37.) These joinders are not a proper method of joining parties in federal court, and therefore have no legal effect under the Federal Rules of Civil Procedure. Defendants filed an Opposition and Motion to Strike the joinders. (Doc. No. 40.) Plaintiffs then sought to cure the procedurally flawed joinders by filing a Motion to Intervene and a Motion for Leave to File Joinder. (Doc. No. 43.) On June 17, 2011, the Court held a hearing in which it granted Defendants' Motion to Strike the improper joinders and

2

denied Plaintiffs' Motion to Intervene and Motion for Leave to File Joinder. The Court reminded Plaintiffs of its inability to ignore the Federal Rules of Civil Procedure and instructed Plaintiffs that, if they wanted to add new parties, they would have to submit a Motion for Leave to File a Third Amended Complaint. The Court further advised Plaintiffs to indicate in their motion why the new parties were important to the case and why they were not added earlier.

On June 24, 2011, Plaintiffs filed the pending Motion for Leave to File Third Amended Complaint (Doc. No. 44). Plaintiffs' proposed Third Amended Complaint (the "Proposed Complaint") adds a number of new plaintiffs and defendants. (Doc. No. 44, Ex. 3.) The Proposed Complaint adds as plaintiffs seven former teachers at the Academy, Sedalia Pippins, Rufus Porter, Andrea Johnson, Jacqueline Bell-Toran, Theaola Robinson, Urica Samuel, and Charles Solari ("Proposed Teacher-Plaintiffs"). (*Id.* ¶ 13.) It also adds the Academy, formerly a defendant in this case, as a plaintiff. (*Id.* ¶ 14.) The Proposed Complaint adds as defendants The Walt Disney Company; ABC Television Network, Inc.; CC Texas Holding Co., Inc.; and KTRK Television, Inc. (the "Media Defendants"). (*Id.* ¶ 21.)

### B.  Factual Background

This case arises from the abrupt closure of the Academy, a charter school located in Houston's Fifth Ward, and the impact of the closure on approximately 500 students and their families. The Court finds it useful to consider separately the factual background as provided in each of these complaints.

### 1.  Plaintiffs' Second Amended Complaint

Plaintiffs' Second Amended Complaint focuses on the events leading to the closure of the Academy. A summary of these events is provided below and, except as noted, does not appear to be in dispute. The Academy was granted an open-enrollment charter (the "Charter") by the Texas State Board of Education ("SBOE") on November 2, 1998. (Doc. No. 19, Pl. Am. Compl. ¶ 24.) The Charter specified that it would remain in effect from November 2, 1998 through July 31, 2003, unless renewed or terminated. Paragraph 6 of the Charter states that it may be renewed upon "timely application" by the Academy for an additional period of time determined by the SBOE. Upon the Charter's expiration on July 31, 2003, the Academy made a timely application for renewal. The TEA allowed the Academy to continue operating during the pendency of the renewal application.

On July 8, 2010, the Commissioner notified the Academy's then-executive director, Theaola Robinson, that he intended to appoint a Board of Managers and a new superintendent in light of the ongoing financial, academic, and governance issues with the Academy. (Pl. Am. Compl., Ex. 2, at 1.) On August 19, 2010, a "record review" hearing was held to provide Ms. Robinson and the Academy with an opportunity to respond to the Commissioner's plan to appoint a Board of Managers and a new superintendent. (Pl. Am. Compl., Ex. 2, at 2.) On September 3, 2010, the Commissioner sent a letter to Ms. Robinson and the members of the Academy's board of directors notifying them that he had decided to appoint a Board of Managers and a new superintendent, Rick Schneider. (Pl. Am. Compl., Ex. 2, at 1, 4.) Under Texas Education Code ("TEC") § 39.112(b), the Commissioner's appointment of a Board of Managers suspended the powers of the Academy's board of directors and Ms. Robinson.

On September 10, 2010, the new Board of Managers posted notice of a meeting the Board would be holding on September 13, 2010. (Pl. Am. Compl., Ex. 3.) The notice was accompanied by an agenda stating that meeting would include "discussion and possible action on suspending school programs and/or operations due to budget shortfall." (*Id.* at 3.) In addition, the agenda stated that the Board would consider the "assignment, reassignment, termination or other action" with respect to the school's superintendent/CEO, administrative staff, instructional staff, and other employees. (*Id.*) Neither the notice nor the agenda referred to the possibility of permanently closing the Academy or revoking its Charter.

On September 14, 2010, the new superintendent, Rick Schneider, notified students' parents that the Board of Managers had voted the night before to suspend operations of the school effective at the close of that very same day (September 14th). (Pl. Am. Compl., Ex. 4.) Mr. Schneider's note did not offer parents any assistance in locating another school for their children aside from attaching a list of approximately forty schools in the Houston, Aldine, and North Forest school districts with addresses and phone numbers. (*Id.*) Parents were told that they could pick up their children's school records over the next two business days between 9:00 a.m. and 3:15 p.m. (*Id.*) After Thursday, September 16, 2010, parents would have to contact a regional service center to request their children's records. (*Id.*)

Believing the Board of Managers' suspension of operations to be unauthorized, the Academy's former administrator, Ms. Robinson, along with several other Academy staff members, allegedly engaged in a number of disruptive actions on September 14, 2010. The staff members and former administrator allegedly told students to rip up the

note from Mr. Schneider to their parents relaying the fact of the Academy's suspension of operations. (Pl. Am. Compl., Ex. 7, at 3.)  Further, the "former superintendent"[1] allegedly told students during a school assembly that the TEA did not think the students were "good enough" to be at the Academy and was shutting down the school for that reason. (*Id.*) This person also allegedly told the assembled students that she would not allow Mr. Schneider to carry out the closure of the Academy. (*Id.*) Both during the assembly and during an employees-only meeting that day, the former superintendent allegedly stated that she would ensure that the Academy would remain open and instructed staff to report to work in the morning as usual. (*Id.* at 4.) Thereafter, the former superintendent conducted a televised press conference inside the Academy informing the public that the Academy would continue operating despite the decisions of the Board of Managers and Mr. Schneider. (*Id.* at 4.)

The following day, September 15, 2010, the Academy reopened as an "unaccredited private school," using the Academy's facility and school buses. (*Id.* at 5.) By this point, Mr. Schneider had resigned and been replaced by Ron Rowell as superintendent of the Academy. Mr. Rowell attempted to prepare students' records for distribution to their parents, but was refused access to these records. (*Id.* at 5-6.) Staff from a regional educational service center were similarly refused entrance to the Academy. (*Id.* at 5.)

On September 16, 2010, the Commissioner issued an order suspending the charter operations and funding of the Academy. (*Id.*) TEC § 12.1162(b) authorizes the Commissioner to "temporarily withhold funding, suspend the authority of an open-

---

[1] Though the exhibits only refer to this person as the "former superintendent," the Court interprets these documents as referring to Ms. Robinson.

6

enrollment charter school to operate, or take any other reasonable action the commissioner determines necessary to protect the health, safety, or welfare of students enrolled at the school based on evidence that conditions at the school present a danger to the health, safety, or welfare of the students." In his order, the Commissioner stated that his finding that conditions at the academy presented a danger to the health, safety, or welfare of the students was based upon the actions of the Academy's staff and former administration during the previous two days. (*Id.* at 6.) As required by TEC § 12.1162(d), the Commissioner scheduled a hearing on September 21, 2010.

The hearing mandated under TEC § 12.1162(d) was held on September 21, 2010 before the Commissioner's designee, Emi Johnson. In a report to the Commissioner dated September 22, 2010, Johnson stated that conditions at the Academy presented a danger to the health, safety, or welfare of the students, as evidenced by the following incidents: (1) school staff instructed students to rip up the communication to parents issued by the school superintendent notifying parents that the school would suspend operations on September 14; (2) school staff told students that TEA did not think the students were "good enough"; (3) school staff directed students to ride on buses and attend classes on September 15; and (4) school staff obstructed the superintendent's access to school records and the school facility. (Pl Am. Compl., Ex. 8.) Johnson noted that there was no indication that the Academy would comply with the September 13 decisions of the Board of Managers. (*Id.*)

After this hearing, TEC § 12.1162(e) required the Commissioner either to cease the suspension of the Academy's operations, or to initiate an action pursuant to TEC § 12.116 to modify, place on probation, or revoke the Charter. The Commissioner elected

to initiate revocation proceedings as to the Academy's Charter. On September 24, 2010, the Commissioner initiated revocation of the school's charter pursuant to TEC § 12.115(a) and 19 TAC § 100.1021(a). (Pl. Am. Compl., Ex. 9.) In his letter, the Commissioner outlined the following grounds for revocation of the charter: (1) failure to protect the health, safety or welfare of students; (2) material violations of the open-enrollment charter; (3) two consecutive years of unsatisfactory ratings; (4) serious unsatisfactory fiscal performance; (5) unsatisfactory compliance performance for three consecutive school years; and (6) failure to renew a lease for the school facility. (*Id.*)

It is unclear whether the Commissioner's September 24 letter served merely as a notice of the Commissioner's intent to revoke the Academy's Charter, or whether it actually revoked the Charter itself. TEC § 12.116(b) states that, when revoking or denying renewal of a charter, the Commissioner must provide an opportunity for a hearing to the charter holder and to the parents and guardians of students at the school. *See also* 19 TAC § 100.1021(b) (stating that the Commissioner "shall notify the charter holder before modifying, placing on probation, revoking, or denying renewal of the school's charter") (emphasis added). On the other hand, 19 TAC § 100.1022(e)(1) states that an "open-enrollment charter authorizing a charter school that fails to protect the health, safety, or welfare of the students enrolled at its school shall be revoked *effective immediately*."

In either case, the Commissioner's September 24 letter informed the Academy that it could request a hearing under 19 TAC § 100.1021(d) if it notified the Commissioner of such a request within ten business days. Also on September 24, the Board of Managers posted notice of a hearing that would be held on September 27, 2010.

(Pl. Am. Compl., Ex. 10.) The agenda for the September 27 hearing included implementation of the Commissioner's action. (*Id.* at 2.) On September 27, 2010, Mr. Rowell sent a communication to parents reiterating that the "Board of Managers of Benji's voted on Monday evening, September 13, 2010, to suspend operations of the school effective at close of business on Tuesday, September 14, 2010." (Pl. Am. Compl., Ex. 11.) The superintendent characterized the Commissioner's hearing on September 22, 2010 as resulting in a "final Order from the Office of the Commissioner to SUSPEND CHARTER OPERATIONS AND FUNDS." (*Id.*)

On September 27, 2010, Plaintiffs filed suit in this Court alleging that Defendants' actions to suspend operations and revoke the Academy's Charter violated their statutory due process rights under IDEA, 20 U.S.C. § 1415, and their constitutional due process rights. In addition, Plaintiffs claimed that Defendants' actions were arbitrary and capricious and violated the Texas Educational Code and the regulations promulgated thereunder.

### 2.  Plaintiffs' Proposed Complaint

Plaintiffs' Proposed Complaint begins with the above facts, and then continues with a more detailed explanation of the Academy staff members' resistance to the Commissioner's decision to close the school. After this decision was made, "the teachers agreed to continue to report, the bus drivers to transport the children, and the parents and students to continue to come to school" as an act of "peaceful disobedience" towards the actions taken by the TEA. (Doc. No. 44, Ex. 3, ¶ 65.) In response to their resistance, Plaintiffs allege that "[a] new plan was immediately hatched to quash [their] peaceful and exemplary defiance." (*Id.* ¶ 68.) This plan, according to Plaintiffs, was two-fold. The first

part of the plan was "aimed at quashing public support for [Proposed Plaintiff Theaola] Robinson's leadership" of the resistance and "destroying Mrs. Robinson's reputation in the community at large as a means to undermine her support." (*Id.* ¶¶ 69.) To accomplish this goal, an unnamed entity decided to "report to the major new organizations…that over $3 million in public funds given to Benji's [was] unaccounted for, with the clear intent to give the impression that Mrs. Robinson had stolen this vast amount of public money and that Benji's was in effect nothing more than a scam." (*Id.* ¶ 70.) The second part of the plan, Plaintiffs allege, was the Commissioner's decision to deem staff members' defiance a danger to the safety, health, and welfare of the students. (*Id.* ¶ 78.)

On September 15, 2011, KTRK aired a two and a half minute segment on the closure of the Academy. The field reporter, Cynthia Cisneros, allegedly reported that, "[a]ccording to the State, millions in taxpayer dollars cannot be accounted for." (Pl. Am. Compl. ¶ 74.) According to Plaintiffs, this video was published on ABC's website, along with a printed article including a statement that "[t]he state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the more than $3 million of taxpayer money given last year has been spent." (*Id.*) Plaintiffs state that this article "generated 18 Facebook recommendations and 29 comments on KTRK's website," many of which were negative. (*Id.* at 75.)

Also on September 15, My Fox Houston ran a story about the Academy that did not mention the millions of dollars unaccounted for. (*Id.* at 76.) Nonetheless, Fox readers posted comments which reflected their awareness of the missing money, and which mentioned Theaola Robinson as the possible culprit behind its disappearance. (*Id.*) The public had a similar reaction to a September 15, 2010 story in the Houston Chronicle,

which again made no mention of the missing money. (*Id.* ¶ 77.) KTRK aired a second segment on the Academy on September 25, 2010. (*Id.* at 79.) Comments on KTRK's website again indicated readers' concern, and again mentioned Theaola Robinson. (*Id.* ¶ 80.)

On September 27 and September 30, KTRK ran stories about Plaintiffs' lawsuit filed in this Court. Those stories, which again referred to the fact that the state did not know "how the academy spent $3 million of state money," generated more comments on KTRK's website, several of which were critical of Ms. Robinson. (*Id.* ¶¶ 82-86.) Plaintiffs describe three subsequent news reports in which KTRK, My Fox Houston, and the Houston Chronicle each reported on the situation at the Academy. Again, Plaintiffs point out, the KTRK story referred to the millions of dollars missing, whereas the My Fox Houston and Houston Chronicle stories did not. (*Id.*  86-89.) Still, comments on both KTRK's and the Houston Chronicle's websites condemned the Academy and Ms. Robinson. (*Id.*)

In their Proposed Complaint, Plaintiffs admit that they do not actually know whether KTRK's reports on the missing funds can be attributed to anyone other than the KTRK itself. According to Plaintiffs, it remains for discovery to reveal whether these reports were a result of a conspiracy between the Media Defendants and the TEA. (*Id.* ¶ 73.)

## II.   Analysis

### A.  Legal Standard

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleadings once as a matter of course. Fed. R. Civ. P. 15(a)(1). Thereafter, pleadings may be

amended "only with the opposing party's written consent or the court's leave." Fed. R.

Civ. P. 15(a)(2). Although a court should freely give leave when justice so requires, leave

to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203

F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d

594, 598 (5th Cir. 1981)).

A district court reviewing a motion to amend pleadings under Rule 15(a) may

consider factors such as "undue delay, bad faith or dilatory motive ... undue prejudice to

the opposing party, and futility of amendment." *In re Southmark Corp.*, 88 F.3d 311,

314–15 (5th Cir. 1996). To determine "futility," the Fifth Circuit applies "'the same

standard of legal sufficiency as applies under Rule 12(b)(6).'" *Stripling v. Jordan Prod.

Co.*, 234 F.3d 863, 873 (5th Cir. 2000) (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d

Cir. 2000)). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept

the complaint's well-pleaded facts as true and view them in the light most favorable to

the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule

12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but

must provide the plaintiff's grounds for entitlement to relief— including factual

allegations that when assumed to be true 'raise a right to relief above the speculative

level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft

v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

A court applying the Rule 12(b)(6) standard generally cannot look beyond the pleadings

when determining whether an amended complaint would be subject to dismissal for

failure to state a claim. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000). The Fifth Circuit has recognized as futile amended claims over which a court would have no jurisdiction. *See McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222–23 (5th Cir. 1989).

### B. Discussion

In considering whether Plaintiffs' Motion for Leave to Amend implicates undue delay, bad faith, undue prejudice to the opposing party, or futility, the Court considers separately each of the new claims that Plaintiffs seek to add in their Proposed Complaint.

### 1. Proposed Teacher-Plaintiffs' Claims against Original Defendants

The Proposed Teacher-Plaintiffs—Sedalia Pippins, Rufus Porter, Andrea Johnson, Jacqueline Bell-Toran, Theaola Robinson, Urica Samuel, and Charles Solari—assert claims similar in kind to those alleged by the teachers in Plaintiffs' Second Amended Complaint, namely, the deprivation of a protected property right without due process of law. (Doc. No. 44, Ex. 3 ¶ 126.)

At a hearing before this Court on June 17, the Court informed Plaintiffs that, if they wanted the Court to grant leave to file a third amended complaint, their motion would need to indicate why the new parties were not added earlier and why they are important to this case. Plaintiffs appear unable to answer these questions.[2] The only explanation Plaintiffs provide is that Plaintiffs attempted to join these parties earlier, but that those attempts were stricken by the Court as procedurally defective. (Doc. No. 44 ¶ 3.) The Court is familiar with Plaintiffs' procedurally improper joiners, as it was because

---

[2] In fact, Plaintiffs reiterate their misconception that, through their improper joinders, a number of parties "joined as parties plaintiff." (Doc. No. 49, at 2.) Plaintiffs are under the impression that, after these parties joined as plaintiffs, the Court ordered the joinders stricken. (Doc. No. 49, at 2.) The Court reiterates that Plaintiffs' improper joinders at no time had the legal effect of joining any parties in this case.

these defective pleadings that the Court instructed Plaintiffs to add more precision to this motion.

Notwithstanding the Court's concern with Plaintiffs' failure to provide the requested explanation, it ultimately concludes that the Proposed Teacher-Plaintiffs' claims against the Original Defendants may be added. These claims are not futile because, as the Court stated in its October 10, 2010 Memorandum and Order allowing Plaintiffs to file a Second Amended Complaint, the Court "finds it plausible that the Proposed Teacher-Plaintiffs possessed an entitlement to continued employment giving rise to a property interest." (Doc. No. 16, at 11.) Further, the Court finds that the addition of the Proposed Teacher-Plaintiffs would not cause undue delay or unfairly prejudice to Defendants. Because the procedural due process claims of the Proposed Teacher-Plaintiffs are identical to those of the Teacher-Plaintiffs in Plaintiffs' Second Amended Complaint, the additional burden on Defendants should be minimal. The Court therefore grants Plaintiffs leave to file a third amended complaint including the Proposed Teacher-Plaintiffs' claims against the Original Defendants for violations of procedural due process in connection with dismissal or termination of employment.

### 2. Theaola Robinson's Claims Against Original Defendants

In addition to her due process claims, Theaola Robinson appears to assert claims against the Original Defendants for conspiracy and libel. (Doc. No. 44 ¶ 3; Doc. No. 49, at 4.) Plaintiffs' Proposed Complaint alleges that "one broadcaster either conspired with the TEA to deprive Plaintiffs of constitutional rights, or took it upon itself to defame Benji's and its founder." (*Id.* ¶ 73.)

### a. Conspiracy

If a conspiracy claim is intended here, such a claim is futile due to Plaintiffs' failure to plead the facts necessary to support a claim of conspiracy. The elements of civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). While Plaintiffs allege the first two elements, they do not allege the following three. Specifically, Plaintiffs do not allege a meeting of the minds because Plaintiffs simply do not know whether there was one. Plaintiffs state that "one broadcaster either conspired with the TEA to deprive Plaintiffs of constitutional rights, or took it upon itself to defame Benji's and its founder." (*Id.* at 15.) Plaintiffs also describe a "plan…hatched to quash the peaceful and exemplary defiance of an arbitrary action," (Doc. No. 44, Ex. 3, at 14), though they fail to indicate who hatched this alleged plan. These statements do not indicate a conspiracy, and thus do not warrant granting Plaintiffs leave to amend their complaint to assert a conspiracy claim.

### b.  Libel Under Section 1983

In a hearing before this Court on June 17, 2011, Plaintiffs' counsel indicated that the libel allegations against the individual defendants were not intended as a separate cause of action, but rather were a "damages claim" arising from the Original Defendants' alleged due process violations. Thus, Plaintiffs indicated that they were alleging denial of due process under Section 1983, the result of which was libel against Ms. Robinson. In support of this argument, Plaintiffs' counsel directed the Court to *Paul v. Davis*, 424 U.S. 693 (1976).

*Paul v. Davis* stands for the proposition that, while a state may protect against injury to reputation through its tort law, damage to a person's reputation alone does not implicate a "liberty" or "property" interest of the sort protected by the Due Process Clause. 424 U.S. at 712. However, the Court held that a charge of defamation might state a cause of action under Section 1983 when an individual's reputation is stigmatized in connection with the denial of a liberty or property interest. *Id.* at 709-11. The Fifth Circuit has held that this "stigma plus" test may be met when a plaintiff proves (1) "concrete, false factual representations or assertions, by a state actor, of wrongdoing on the part of the claimant," and (2) "that the state sought to remove or significantly alter a life, liberty, or property interest recognized and protected by state law or guaranteed by one of the provisions of the Bill of Rights that has been 'incorporated.'" *San Jacinto Savings & Loan v. Kacal*, 928 F.2d 697, 701-02 (5th Cir. 1991).

Here, Plaintiffs do not allege concrete, false, factual representations by a state actor. Rather, as discussed above, they suggest that it might be possible that a member of the TEA could have conspired with KTRK to develop the allegedly libelous reports. Because Plaintiffs' allegations are insufficient to state a claim under Section 1983, the Court denies Plaintiffs' motion for leave to amend to include such claims.

### 3. Theaola Robinson's Claims Against the Media Defendants

The Proposed Complaint adds the Media Defendants, stating that they are "the owners and operator of local television channel KTRK, ABC, Channel 13." (Doc. No. 44, Ex. 3 ¶ 21.) The Proposed Complaint asserts that the "Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367." (*Id.* ¶ 22.) Plaintiffs' Motion to Compel further clarifies that Ms. Robinson is stating claims against the media

defendants under 42 U.S.C. § 1983 and the common law of libel. (Doc. No. 44, Ex. 1, at 2.) The Media Defendants dispute this Court's subject matter jurisdiction.

### a. Federal Question Jurisdiction Based Upon Claims Under 42 U.S.C. § 1983

District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Claims under 42 U.S.C. § 1983, which provides a remedy for the deprivation of federally secured rights, give rise to federal question jurisdiction under Section 1331. However, in order to seek a remedy under Section 1983, a plaintiff must show that he or she was deprived of a federal right by an individual or entity acting "under color of" state law. 42 U.S.C. § 1983. Because the Media Defendants are non-government actors, the Court first considers whether Plaintiffs allege that these defendants were acting under color of state law. Because the Court concludes that Plaintiffs' allegations of state action are insufficient, it need not consider whether the Media Defendants deprived Plaintiffs of a federal right.

Private individuals or entities may, in certain circumstances, be regarded as acting under color of state law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Hennessey v. National Collegiate Athletic Ass'n*, 564 F.2d 1136, 1144 (5th Cir. 1977) (state participation in a nominally private activity can result in a characterization of that activity as "state action" for purposes of Section 1983). For example, a private party may be liable under Section 1983 for conspiring with state actors to violate civil rights. *Dennis v. Sparks*, 449 U.S. 24 (1980); *Keko v. Hingle*, 318 F.3d 639 (5th Cir. 2003), *reh'g en banc denied*, 61 Fed. App'x (5th Cir. Feb. 4, 2003). To support a Section 1983 claim on the basis of a conspiracy between the state and private actors, a plaintiff "must allege facts that suggest: 1) an agreement between the private and public defendants to commit

an illegal act…and 2) an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994) (internal citations omitted).

Allegations of an agreement to commit an illegal act must include a statement, or at least an implication, that the defendants agreed "to undertake a scheme to deprive [a plaintiff] of his constitutional rights." *Id.* at 1343-44. Moreover, a "vague and conclusory allegation [of conspiracy]…is insufficient." *Johnson ex rel. Wilson v. Dowd*, 305 Fed. App'x. 221 (5th Cir. 2008). Allegations that base a claim of conspiracy on nothing other than a plaintiff's personal belief fail to state a claim of conspiracy under Section 1983. *McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir. 1989).

Here, Plaintiffs refer to a "plan…hatched to quash the peaceful and exemplary defiance of an arbitrary action," but they fail to indicate who hatched this alleged plan. (Doc. No. 44, Ex. 3, at 14.) Plaintiffs further state that "one broadcaster either conspired with the TEA to deprive Plaintiffs of constitutional rights, or took it upon itself to defame Benji's and its founder." (*Id.* at 15.) This allegation is not only conclusory and unsupported by any allegations of fact, but it indicates that Plaintiffs see a conspiracy as only one possible explanation for the purported defamation.

Plaintiffs have not alleged sufficient facts to suggest an agreement between state actors and the Media Defendants to commit an illegal act. Because Plaintiffs' Section 1983 claims against the Media Defendants would have to be dismissed pursuant to Rule 12(b)(6), the Court denies as futile Plaintiffs' motion to leave to amend their complaint to include such claims. As these were Plaintiffs' only federal claims against the Media Defendants, the Court finds that it does not have federal question jurisdiction over the Media Defendants.

### b. Supplemental Jurisdiction Based Upon State Law Libel Claims

In the absence of federal question jurisdiction, the Court may hear Plaintiffs' libel claims against the Media Defendants only if it has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Section 1367 gives federal courts supplemental jurisdiction over "claims that are so related to claims in the action within [a court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

As a part of its supplemental jurisdiction, a federal court may hear "claims that involve the joinder or intervention of additional parties." *Id.* Such claims give rise to what was formerly known as "pendent party jurisdiction," a form of supplementary jurisdiction through which "federal claims are levied against one defendant, while state law claims are alleged against a different, nondiverse defendant." *Rodriguez v. Pacificare of Tex., Inc.*, 980 F.2d 1014, 1018 (5th Cir. 1993). Section 1367(a) codifies the concept of pendent party jurisdiction by granting district courts supplemental jurisdiction over claims that involve the joinder or intervention of additional parties. If the factual basis for claims against a pendent party is "sufficiently intertwined" with that of claims against the original party, "a federal court [can] adjudicate the state law claims against the pendent party." *Rodriguez*, 980 F.2d at 1018. Federal and state law claims are sufficiently intertwined when the claims "derive from a common nucleus of operative fact," *State National Insurance Co. v. Yates,* 391 F.3d 577, 579 (5th Cir. 2004) (internal quotations omitted).

In this case, Plaintiffs seek to bring a federal claim against the Original Defendants and, in the same action, to bring a state law libel claim against the Media

Defendants. Plaintiffs' state law claim may be brought only if the Court has supplemental jurisdiction over the Media Defendants—that is, only if Plaintiffs' federal and state law claims derive from a common nucleus of operative fact. The Court is convinced that they do not.

Plaintiffs' libel claim against the Media Defendants is discrete and separate from their federal claims against the Original Defendants. Though Plaintiffs insist that all of the claims are based upon "one event inflicting multiple harms on variously situated persons," but they do not explain how this is so. (Doc. No. 44, at 2.)[3] As the Court reads Plaintiffs' briefings, there are two bases for their contention that the closure of the Academy and the alleged libel are related. The first is temporal. Plaintiffs link the TEA's closure of the Academy with KTRK's news report because the allegedly libelous report aired "the day after the unlawful closure in a direct attempt of furtherance of the state's efforts to deprive constitutional rights and summarily close Benji's." (*Id.*) Plaintiffs also state that "the timing and the content of the damaging libel was maliciously intended to further the destruction of civil rights begun the previous two days." (Doc. No. 49, at 4.) Plaintiffs seem to urge that, because the two events took place within a few days of one another, an inference of their relatedness is appropriate. The Court cannot agree. In this case, a temporal connection itself indicates little other than well-times reporting, as news reports tend to air shortly after the reported-upon event takes place. In fact, on the same day that KTRK ran its initial coverage of the closure of the Academy, My Fox Houston and The Houston Chronicle ran similar stories. (Doc. No. 44, Ex. 3 ¶¶ 74-77.)[4] The mere

---

[3] While Plaintiffs state that the alleged libel "inflicted damage on all Plaintiffs," (Doc. No. 49, at 4), they do not explain how the libel actually harmed any of the Plaintiffs aside from Ms. Robinson.
[4] The critical difference between these reports, according to Plaintiffs, is that KTRK was the only station to report on the missing $3 million. (Doc. No. 44, Ex. 3 ¶¶ 74-77.)

fact that KTRK aired a story about the Academy two days after the Academy was shut down does not indicate that the TEA was involved in KTRK's news report.

The second basis for Plaintiffs' contention that the Academy's closure is linked to KTRK's alleged libel is Plaintiffs' belief that a conspiracy may have existed between the TEA and KTRK. As discussed above, Plaintiffs state that a "broadcaster either conspired with the TEA to deprive Plaintiffs of constitutional rights, or took it upon itself to defame Benji's and its founder." (Doc. No. 44, Ex. 3 at 15.) In this statement, Plaintiffs admit that the TEA may have had nothing to do with the alleged defamation, explaining that "it remains for discovery to reveal the source of this devastating calumny." (*Id.*) Plaintiffs' suggestion that the TEA might have been involved with the Media Defendants' purported defamation is unsupported by any factual allegations. In fact, it is not even clear that Plaintiffs believe that a conspiracy is a *likely* explanation for KTRK's reports. Rather, they suggest only that such a conspiracy may have existed. Neither the temporal connection nor the alleged possible conspiracy persuades the Court that Plaintiffs' claims against the Media Defendants share a common nucleus of operative fact with claims against the Original Defendants. The Court therefore does not have supplemental jurisdiction over Plaintiffs' state law claims against the Media Defendants, and leave to amend to add these claims must be denied.

**III.    CONCLUSION**

For all the reasons stated above, Plaintiffs' Motion for Leave to File Third Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**:

(1) Plaintiffs are granted leave to file a Third Amended Complaint including claims by the Proposed Teacher-Plaintiffs against the Original Defendants for violations of procedural due process in connection with dismissal or termination of employment.

(2) Plaintiffs are denied leave to file claims against the Original Defendants for conspiracy.

(3) Plaintiffs are denied leave to file claims against the Original Defendants on the basis of libel as giving rise to a claim under 42 U.S.C. § 1983.

(3) Plaintiffs are denied leave to file claims against the Media Defendants.

**IT IS SO ORDERED**.

**SIGNED** this 13th day of September, 2011.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE