UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHENITHA COMB, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-3498 |
| | § | |
| BENJI'S SPECIAL EDUCATION | § | |
| ACADEMY, *et al*, | § | |
| | § | |
| Defendants. | § | |

---

## MEMORANDUM AND ORDER

---

Pending before the Court is a Motion for Summary Judgment filed by Defendants James Holman, Kay Karr, Earnestine Patterson, Ron Rowell, Rick Schneider, and Robert Scott (collectively, the "Defendants"). (Doc. No. 51.) After considering the motion, all responses thereto, and the applicable law, the Court determines that the motion must be GRANTED.

### I.     BACKGROUND

This is an action by a group of parents, guardians, and teachers challenging the abrupt closure of Benji's Special Educational Academy, Inc. ("the Academy" or "Benji's"). Plaintiffs allege that the closure of Benji's violated a number of their rights. Parents and guardians of former Benji's students (the "Parent-Plaintiffs") bring claims for violations of the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400-1490, and 42 U.S.C. § 1983. Randolph Nichols and Nancy Watta, former teachers at Benji's who lost their jobs when the school closed (the "Teacher-Plaintiffs"), also

1

claim violations of 42 U.S.C. § 1983. Defendants are Rick Schneider, the former superintendent of Benji's; Ron Rowell, the current superintendent; Robert Scott, the Commissioner of the Texas Education Agency ("TEA"); and Kay Carr, James Holman, and Earnestine Patterson, members of the Board of Managers installed at Benji's by the TEA.

The facts of this case—which are undisputed, unless otherwise noted—have been discussed in two prior Orders from this Court. (Doc. Nos. 16, 50.) The Court outlines the facts of the case once again, this time considering them in the context of the pending summary judgment motion.

In 1998, Benji's was granted an open-enrollment charter (the "Charter") by the Texas State Board of Education ("SBOE"). (Pl. Am. Compl. ¶ 24, Doc. No. 19.) The Charter specified that it would remain in effect from November 2, 1998 through July 31, 2003, unless renewed or terminated. Paragraph 6 of the Charter states that it may be renewed upon "timely application" by the Academy for an additional period of time to be determined by the SBOE. Upon the Charter's expiration on July 31, 2003, the Academy made a timely application for renewal. The TEA allowed the Academy to continue operating during the pendency of the renewal application.

On July 8, 2010, the Commissioner of the TEA notified the Academy's then-executive director, Theaola Robinson, that he intended to appoint a Board of Managers and a new superintendent in light of the ongoing financial, academic, and governance issues with the Academy. (Pl. Am. Compl., Ex. 2 at 1.) On August 19, 2010, a "record review" hearing was held to provide Ms. Robinson and the Academy with an opportunity to respond to the Commissioner's plan to appoint a Board of Managers and a new

superintendent. (Pl. Am. Compl., Ex. 2 at 2.) On September 3, 2010, the Commissioner sent a letter to Ms. Robinson and the members of the Academy's board of directors notifying them that he had decided to appoint a Board of Managers and a new superintendent, Rick Schneider. (Pl. Am. Compl., Ex. 2 at 1, 4.) Under Texas Education Code ("TEC") § 39.112(b), the Commissioner's appointment of a Board of Managers suspended the powers of the Academy's board of directors and of Ms. Robinson.

On September 6, 2010, the interim Board of Managers held a meeting at which they received a report that Benji's was in an urgent financial condition, and might not be able to continue operating. (Doc. No. 51-2 at 17.[1]) On September 10, 2010, the Board of Managers posted notice of a meeting that the Board would be holding on September 13, 2010. (Pl. Am. Compl., Ex. 3.) The notice was accompanied by an agenda stating that meeting would include "discussion and possible action on suspending school programs and/or operations due to budget shortfall." (*Id.* at 3.) In addition, the agenda stated that the Board would consider the "assignment, reassignment, termination or other action" with respect to the school's superintendent/CEO, administrative staff, instructional staff, and other employees. (*Id.*) Neither the notice nor the agenda referred to the possibility of permanently closing the Academy or revoking its Charter. At the September 13 meeting, the Board of Managers voted unanimously to declare financial exigency and to suspend all school programs until further instruction. (Doc. No. 51-2 at 17.)

On September 14, 2010, the new superintendent, Rick Schneider, provided notice to students (which was to be taken home to their parents) that the Board of Managers had

---

[1] This exhibit, submitted with Defendants' Motion for Summary Judgment, is a Proposal for Decision issued by the Administrative Law Judge who heard the appeal by Benji's of the Commissioner's revocation of the Academy's charter. Plaintiffs do not object to this evidence.

voted the night before to suspend operations of the school effective at the close of that very same day (September 14th). (Pl. Am. Compl., Ex. 4.) Schneider's notice included an attached list of approximately forty schools in the Houston, Aldine, and North Forest school districts with addresses and phone numbers, and informed parents that they should make arrangements to enroll their students at other schools beginning the next day. (*Id.*) Parents were told that they could pick up their children's school records over the next two business days between 9:00 a.m. and 3:15 p.m. (*Id.*) After Thursday, September 16, 2010, parents would have to contact a regional service center to request their children's records. (*Id.*)

Believing the Board of Managers' suspension of operations to be unauthorized, the Academy's former administrator, Ms. Robinson, along with several other Academy staff members, engaged in a number of activities to prevent the closure of Benji's. On September 14, Ms. Robinson and other staff members allegedly told students to rip up the note from Mr. Schneider to their parents relaying the fact of the Academy's suspension of operations. (Pl. Am. Compl., Ex. 7 at 3.) Ms. Robinson also apparently told students, during a school assembly held on September 14, that the TEA did not think the students were "good enough" to be at the Academy, and that it was shutting down the school for that reason. (*Id.*) She told the assembled students that she would not allow Mr. Schneider to carry out the closure of the Academy. (*Id.*) Both during the assembly and during an employees-only meeting that day, Ms. Robinson stated that she would ensure that the Academy would remain open, and she instructed staff to report to work in the morning as usual. (*Id.* at 4.) Thereafter, Ms. Robinson conducted a televised press conference inside

4

the Academy informing the public that the Academy would continue operating despite the decisions of the Board of Managers and Mr. Schneider. (*Id.* at 4.)

The following day, September 15, 2010, the Academy reopened as an "unaccredited private school," using the Academy's facility and school buses. (*Id.* at 5.) By this point, Mr. Schneider had resigned and been replaced by Ron Rowell as superintendent of the Academy. Mr. Rowell attempted to prepare students' records for distribution to their parents, but was refused access to these records. (*Id.* at 5-6.) Staff from a regional educational service center similarly were refused entrance to the Academy. (*Id.* at 5.)

On September 16, 2010, Commissioner Scott issued an order suspending the Academy's authority to operate as a charter school. (*Id.*) In his order, the Commissioner expressed a finding that conditions at the Academy presented a danger to the health, safety, or welfare of the students, and based this finding upon the actions of the Academy's staff and former administration during the previous two days. (*Id.* at 6.) The Commissioner's letter indicated that a hearing regarding the suspension would be held on September 21, 2010, as required by TEC § 12.1162(d).

The hearing was held on September 21 before the Commissioner's designated hearing officer, Emi Johnson. In a report to the Commissioner dated September 22, 2010, Johnson stated that conditions at the Academy presented a danger to the health, safety, or welfare of the students, as evidenced by the following incidents: (1) school staff instructed students to rip up the communication to parents issued by the school superintendent notifying parents that the school would suspend operations on September 14; (2) school staff told students that TEA did not think the students were "good

enough"; (3) school staff directed students to ride on buses and attend classes on September 15; and (4) school staff obstructed the superintendent's access to school records and the school facility. (Pl Am. Compl., Ex. 8.) Johnson noted that there was no indication that the Academy would comply with the September 13 decisions of the Board of Managers. (*Id.*) The Commissioner adopted Johnson's report the same day that it was presented to him. (Doc. No. 51-2 at 20.)

On September 24, the Commissioner issued a notice of intention to revoke the school's open-enrollment charter. (*Id.* at 21.) The notice informed the Academy that it could request a hearing if it notified the Commissioner of such a request within ten business days. (*Id.*) A formal request for hearing was made on October 7, 2010, leading to an administrative hearing on August 12-17, 2011. (*Id.*) Counsel for the Plaintiffs in this case appeared on behalf of Benji's, opposing the charter revocation. A final order was issued on January 17, 2012, revoking the Academy's charter and permanently closing the school. (Doc. No. 51-2.)

## II.   LEGAL STANDARD

Summary judgment is appropriate where the pleadings and evidence show that no genuine issue of material fact exists, and that the movant therefore is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is material if its resolution in favor of one party might affect the outcome

of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316,

326 (5th Cir. 2009) (quotations and footnote omitted).

     Factual controversies should be resolved in favor of the nonmoving party. *Liquid*

*Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case

where critical evidence is so weak or tenuous on an essential fact that it could not support

a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted).

Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with

conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz*

*v. Superior Energy Servs., LLC*, 341 F. App'x 26, 28 (5th Cir. 2009) (citation omitted).

The Court should not, in the absence of proof, assume that the nonmoving party could or

would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075.

## III.    ANALYSIS

### A.  Mootness

     Plaintiffs seek injunctive relief asking the Court to order Defendants to rescind the

notice of suspension or termination of operations of the Academy. Defendants argue that

the Court lacks subject matter jurisdiction over Plaintiffs' injunctive relief claim, urging

that the revocation of the Academy's charter on January 17, 2012 renders this claim

moot.

     The "case or controversy" requirement of Article III, § 2, of the Constitution

requires that, "throughout the litigation, the plaintiff 'must have suffered, or be threatened

with, an actual injury traceable to the defendant and likely to be redressed by a favorable

judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental*

*Bank Corp.*, 494 U.S. 472, 477 (1990)). "If a dispute has been resolved or if it has

evanesced because of changed circumstances, including the passage of time, it is considered moot." *American Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988). If a case becomes moot, it deprives the court of jurisdiction and should be dismissed under Rule 12(b)(1). *Id.*

It is "beyond dispute that a request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined." *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998); *Marilyn T., Inc. v. Evans*, 803 F.2d 1383, 1384 (5th Cir. 1986), *abrogated on other grounds by Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190 (1991) (plaintiff's appeal from the denial of preliminary injunctive relief against the suspension of a commercial license moot once the license was permanently revoked). Defendants urge that the request for injunctive relief was mooted by the revocation of the Academy's Charter, as, under Section 12.1161 of the Texas Education Code, a school may not continue to operate or receive state funds once its charter has been revoked. Tex. Educ. Code § 12.1161.

Plaintiffs respond that "[t]his is the only forum to which these truly aggrieved and deserving persons can turn to correct a series of injustices that truly outrage all fundamental and essential values of our Republic." (Doc. No. 55 at 3.) They also urge that "if peaceful disobedience to damaging unlawful state administrative action can itself give rise to a new administrative proceeding which moots the damage claims of all aggrieved parties, then state regulation is a monster with rules without any limits whatever." (*Id.* at 4.) Plaintiffs' responses suggest that they misinterpret Defendants' argument, which is not that Plaintiffs' *damage* claims are moot, but rather that their claims for injunctive relief, which this Court can no longer redress, are moot. The Court

agrees that it cannot issue injunctive relief in this case to force the reopening of the Academy. Now that the charter has finally been revoked, the school cannot continue to operate. The Court therefore concludes that Plaintiffs' request for injunctive relief is moot, and must be dismissed under Rule 12(b)(1) for want of jurisdiction.

### B. Teacher-Plaintiffs' Due Process Claims

The Teacher-Plaintiffs bring claims against Defendants under 42 U.S.C. § 1983, alleging that Defendants' actions in suspending the Academy's operations violated the Teacher-Plaintiffs' federal constitutional due process rights. Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a cause of action under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).

In order to prove that their due process rights were violated, Plaintiffs must show that they have "asserted a recognized liberty or property interest within purview of Fourteenth Amendment and that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994)). Thus, the threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest. *DePree v. Saunders*, 588 F.3d 282,

9

289 (5th Cir.2009). In this case, the Teacher-Plaintiffs allege that they were deprived of their property rights in continued employment at the Academy without due process.

Public employees, including teachers, are entitled to due process protections prior to termination only if they have a property interest in continued employment. *Bd. of Regents v. Roth*, 408 U.S. 564, 576-578 (1972). In order to have a property interest, one must have "a legitimate claim of entitlement" to continued employment, rather than a "unilateral expectation of it." *Id.* at 577. Entitlement to continued employment may be founded upon statutory language creating such an entitlement, or contractual or tenure provisions that require a hearing before dismissal or termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

In the absence of an explicit contractual provision, a property interest may arise from an implied contract or mutually understood informal procedures. *Perry*, 408 U.S. at 601-02. Ultimately, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577; *see also McDonald v. City of Corinth*, 102 F.3d 152, 155 (5th Cir. 1996) ("State law controls the analysis of whether [a plaintiff] has a property interest in his employment sufficient to entitle him to due process protection."). Thus, to determine whether the Teacher-Plaintiffs had a property interest in continued employment, the Court must look to Texas law.

"In Texas, there is a presumption that employment is at-will unless that relationship has been expressly altered by contract or by 'express rules or policies limiting the conditions under which an employee may be terminated.'" *Leza v. City of*

*Laredo*, 2011 WL 2078961, at *3 (S.D. Tex. May 26, 2011) (quoting *Muncy v. City of Dallas*, 335 F.3d 394, 398 (5th Cir. 2003)). At-will employees may be terminated at any time, and therefore have no legitimate right to continued employment and no constitutionally protected property interest in their employment. *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 439 (5th Cir. 2001). In this case, there was a written agreement covering the Teacher-Plaintiffs' employment. The agreement, which was signed by both Teacher-Plaintiffs, has an "At Will Statement." (Doc. Nos. 51-6; 61-7.) The statement reads as follows:

> Employment with Benji's Special Educational Academy is an "At Will Agreement" and at any period of time wage, benefit and conditions of employment or employment can be changed or terminated. Either the employee or Benji's Special Educational Academy may terminate the employment relationship at any time, for any reason, without notice or cause.

(*Id.*) Because the Teacher-Plaintiffs were "at-will" employees, Defendants urge that they had no property interest in continued employment with Benji's.

The Teacher-Plaintiffs contend that that they worked at the Academy under a mutual understanding that they could not be dismissed prior to the end of the school year. They seem to premise this understanding on the fact that, under TEC § 12.1161(b), the Commissioner's denial of a charter school's renewal application requires the state to continue funding the school for the remainder of the year. While the Teacher-Plaintiffs may have believed that the Commissioner's decision not to renew the Academy's charter would not result in their immediate termination, they offer no evidence supporting the notion that they could not be immediately terminated for another reason. Indeed, Defendants offer evidence demonstrating that teachers at Benji's knew, or should have

11

known, that they could be terminated at any time. In a memo sent to Benji's faculty by then-CEO, Ms. Robinson, Robinson informed employees that any employee who contacted Child Protective Services without prior approval by Robinson would be subject to termination. (Doc. No. 51-3.) Although entirely unrelated to the issues in this case, Robinson's memo shows that the Academy's faculty members were (or should have been) aware that they could be fired at any time. Ultimately, Plaintiffs have failed to introduce any evidence of representations made to them regarding a promise or other understanding that they were entitled to employment through the end of the school year.

More importantly, though, an implicit understanding that one's position will continue fails in the face of a written policy indicating that it will not. *See Staheli v. Univ. of Miss.*, 854 F.2d 121, 125 (5th Cir. 1988) (holding that plaintiff's alleged property interest in tenure, arising from his implicit, mutual understanding that his position would continue, failed in light of the university's written tenure policy only allowing tenure to be granted by the chancellor of the university); *Batterton v. Tex. Gen. Land Office*, 783 F.2d 1220, 1223 (5th Cir. 1986) (holding that an informal understanding leading to a property interest may stand only in the "absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure"). Here, there is both a written contract specifying at-will status, and evidence that the parties' understanding was or should have been consistent with that contract. As such, the Teacher-Plaintiffs' claims must fail.

### C.  Parent-Plaintiffs' IDEA Claims

The Parent-Plaintiffs claim violations of their statutory right to notice and hearing under the IDEA, 20 U.S.C. § 1415. They also bring a claim under 42 U.S.C. § 1983 based upon the same violations of the IDEA.

The purposes of the IDEA are, among others, "to ensure that all children with disabilities have available to them a free appropriate public education . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." *Id.* §§ 1400(d)(1)(A)-(B). To that end, the IDEA requires that the local education agency ("LEA") or state educational agency effectuate Individualized Education Programs (IEPs) at the beginning of every school year for each child with a disability in the agency's jurisdiction. *Id.* § 1414 (d)(2)(A). In addition, any state educational agency or LEA that receives funding under the IDEA is required to establish and maintain procedures in accordance with 20 U.S.C. § 1415 of the IDEA to ensure that children with disabilities and their parents are "guaranteed procedural safeguards with respect to the provision of a free appropriate public education." *Id.* § 1415(a).

One aspect of the procedural safeguards mandated by IDEA is the requirement of "written prior notice to the parents of a child, in accordance with subsection (c)(1), whenever the local educational agency—(A) proposes to initiate or change . . . the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." *Id.* § 1415(b)(3). Subsection (c)(1) specifies that the notice required must contain a description of the proposed agency action, an explanation of why the agency proposes to take the action, a description of the agency's bases for taking such action, and a statement notifying the parents that they have due process rights under IDEA to challenge such action. *Id.* § 1415(c)(1). A parent must be

13

given an opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free public education to such child." *Id.* § 1415(b)(6)(A). A party wishing to make a complaint under this section must provide "due process complaint notice" to the adversary party and forward a copy of it to the State. *Id.* § 1415(b)(7). The "due process complaint notice" is distinct from the "written prior notice" required to be given by the LEA or state educational agency to a parent prior to the proposed change in placement. The state educational agency or LEA must provide for an impartial due process hearing and appeal. *Id.* §§ 1415(f), (g). Parents may seek judicial review of adverse administrative determinations. *Id.* § 1415(i)(2).

The Parent-Plaintiffs' claims focus on the failure of Defendants to provide them with the prior written notice prior to suspending operations of the Academy. They argue that Defendants' closure of the Academy and their directive to parents of IEP students to find new schools constitutes a change in the "educational placement" of students that triggers the written prior notice requirement of 20 U.S.C. § 1415(b)(3). Defendants argue in response that Plaintiffs have not exhausted their administrative remedies, and that, regardless, the IEP students' transfer to a new school is only a "change in location" and not a "change in educational placement" requiring prior written notice to parents.

Before seeking judicial review, plaintiffs bringing a complaint under the IDEA either must exhaust administrative remedies or must show that exhaustion would be futile or inadequate. *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 112 (5th Cir. 1992); 20 U.S.C. § 1415(l). In the Fifth Circuit, futility may be shown by either "*systematic* violations that a hearing officer would have no power to address," or a settled state policy

14

that cannot be addressed through the IDEA's administrative remedies. *Papania-Jones v. Dupree*, 275 F. App'x 301, 304 (5th Cir. 2008) (quoting *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 113 (2d Cir. 2004)). As the Court has noted before, Plaintiffs cannot escape the administrative exhaustion requirements of the IDEA by pleading a cause of action under 42 U.S.C. § 1983 based upon violations of their rights to written prior notice. *See Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 592 (W.D. Tex. 2006). Thus, if the Court concludes that Plaintiffs have failed to exhaust their IDEA claims, then their Section 1983 claims must fail on the same basis.

In the Court's October 15, 2010 Memorandum and Order, the Court considered Plaintiffs' request for a preliminary injunction. The Court laid out the standard for administrative exhaustion under the IDEA, and concluded that Plaintiffs had not met their burden of showing that they were excused from the administrative exhaustion requirement. (Doc. No. 16 at 25.) Plaintiffs' Response to Defendants' Motion for Summary Judgment does not even address the administrative exhaustion argument made by Defendants. Thus, the Court must rely upon Plaintiffs' arguments asserted earlier in this case: (1) that administrative exhaustion would be futile because Plaintiffs' right to notice has already been violated; (2) that exhaustion would be inadequate because the administrative process will take between 45 and 60 days to complete; and (3) that the violations alleged are systematic and the result of a settled state policy that cannot be addressed in administrative proceedings.[2]

The Court has already held that the first two of Plaintiffs' arguments are insufficient, noting that, though agency review might not be able to remedy Plaintiffs'

---

[2] Plaintiffs did not put forward the third argument explicitly, but the Court has inferred that they intended to make this argument from the cases relied upon in their preliminary injunction briefing. (Doc. No. 16 at 26.)

failure to receive written prior notice, it could fashion an appropriate remedy to address concerns regarding the modification of the students' educational programs. Plaintiffs have not urged reconsideration of this conclusion.

As to Plaintiffs' third argument, the Court found, in its October 15, 2010 Memorandum and Order, that Plaintiffs had not met their burden of showing a systematic violation or a settled state policy. (Doc. No. 16 at 26-27.) Plaintiffs have submitted no further evidence to suggest the presence of either of these factors, and it is clear that they are not implicated in this case. Courts have found systemic violations or settled state policies where plaintiffs are challenging a regulation implementing a state statute, or where deficiencies in the administrative scheme give rise to a plaintiff's injuries. *See, e.g.*, *J.S.*, 386 F.3d at 113-14 (summarizing cases).[3] The "common element" in cases recognizing an exception based upon systemic violations or settled state policies is "that the plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *Id.* In the instant case, Plaintiffs' claims do not implicate the framework and procedures for assessing and placing students in appropriate programs; rather, Plaintiffs allege a single, albeit serious, breakdown in the functioning of these procedures. There is no evidence to support an exemption from the administrative exhaustion requirement. Thus, the Parent-Plaintiffs' claims under both the IDEA and Section 1983 must fail.

### D.  Qualified immunity

---

[3] The Fifth Circuit has noted that it "find[s] the analysis of the Second Circuit in *J.S.* to be instructive." *Papania-Jones v. Dupree*, 275 F. App'x 301, 304 (5th Cir. 2008).

Defendants in this case are all government employees sued in their individual capacities, and thus are entitled to assert a defense of qualified immunity. *Foley v. Univ. of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, as the Court has concluded that none of Plaintiffs' claims can proceed, it need not conduct a qualified immunity analysis.

## IV.   CONCLUSION

For the reasons discussed above, the Court concludes that Defendants' Motion for Summary Judgment must be **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 28th day of March, 2012.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

17